## AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT

I, Robert Plumb, being sworn, depose and state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since June 2016.  I am currently assigned to one of the FBI's Counterintelligence Squads in the Boston Field Office.  My responsibilities include investigating violations of federal criminal laws relating to espionage and theft of trade secrets, the mishandling of classified and defense information, and export control laws.  Previously, I was employed at the FBI as an Intelligence Analyst.  I worked in this capacity for six years. I have participated in numerous investigations, during the course of which I have interviewed witnesses, conducted physical surveillance, executed search warrants, and used other investigative techniques to secure relevant information regarding various federal crimes.

2.     I submit this affidavit in support of a Criminal Complaint charging Dr. Charles Lieber ("LIEBER") with making materially false, fictitious and fraudulent statements in a matter within the jurisdiction of the Executive Branch of the United States, in violation of Title 18, United States Code, Section 1001(a)(2).  Specifically, based upon the evidence gathered thus far in this ongoing investigation, I have probable cause to believe and do, in fact, believe that LIEBER made materially false, fictitious and fraudulent statements regarding his participation in China's Thousand Talents Plan to the U.S. Department of Defense ("DoD") on or about April 24, 2018.  I also have probable cause to believe and do, in fact, believe that, on or about January 10, 2019, LIEBER made and caused to be made a series of materially false, fictitious and fraudulent statements to the National Institutes of Health ("NIH") about his involvement in the Thousand Talents Plan and his affiliation with Wuhan University of Technology ("WUT") in China.

3.     Based on the evidence gathered to date, LIEBER was a "Strategic Scientist" at WUT and a contractual participant in China's Thousand Talents Plan for significant periods between at least 2012 and 2017. The terms of LIEBER's Thousand Talents contract called for LIEBER to be paid up to $50,000 per month in salary and approximately $150,000 per year for living and personal expenses by WUT. LIEBER was also awarded more than $1.5 million by WUT and the Chinese government to establish a research lab and conduct research at WUT.

4.     The information in this affidavit is based upon my training and experience, my personal knowledge of this investigation, information conveyed to me by other law enforcement agents and officials who assisted in the investigation, and the other sources of information described herein. This affidavit is submitted for the limited purpose of establishing probable cause to believe that LIEBER has committed the offenses described above. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation. I have set forth only those facts that I believe are necessary to establish the requisite probable cause.

## FACTS SUPPORTING PROBABLE CAUSE

### Background

5.     LIEBER is a full-time faculty member and Chair of the Department of Chemistry and Chemical Biology at Harvard University in Cambridge, Massachusetts. He has been affiliated with Harvard since approximately 1991. According to LIEBER's biography on Harvard's website, LIEBER's primary area of expertise and research is nanoscience.

6.     At all times relevant to this complaint, LIEBER served as the Principal Investigator of the Lieber Research Group at Harvard University. According to its website, the Lieber Research Group "is focused broadly on science and technology at the nanoscale, using novel synthesized

building blocks to push scientific boundaries in diverse areas from biology/medicine to energy and computing." The Lieber Research Group's website identifies its principal sponsors as NIH and DoD, including the Office of Naval Research ("ONR") and the Air Force Office of Scientific Research ("AFOSR"). Based upon records maintained by NIH, DoD, and Harvard University, I know that the Lieber Research Group has received more than $15,000,000 in grant funding from NIH and DoD since 2008.

7.     A component of the United States Department of Health and Human Services, NIH is a government agency responsible for biomedical and public health research. The NIH conducts its own scientific research through an intramural research program, and also provides major biomedical research funding to non-NIH research facilities through an extramural research program. Many of the non-NIH research facilities that receive funding through NIH's extramural research program are colleges and universities, including Harvard University.

8.     In order to receive NIH funding, non-NIH research institutions must submit a detailed application describing, among other things: (a) the purpose and scope of the proposed research; (b) the amount of funding requested; and (c) how the funding will be used. Both during the application process and periodically after an award is made, the institution must also disclose to NIH all foreign collaboration and foreign sources of research support, including, but not limited to, research grants, cooperative agreements, contracts and/or institutional awards. Additionally, NIH requires research institutions to identify and disclose to NIH significant (typically greater than $5,000) financial conflicts of interest by investigators (that is, the person or persons responsible for the design, conducting the research, and publishing or reporting the research performed pursuant to the grant), including those related to funds received from a foreign institution of higher education or the government of another country. Although it is the research institution itself that

submits the grant application and all other grant-related disclosures to NIH, the individual investigator(s) must certify to the institution and NIH that the information contained in grant applications, post-award submissions and all other grant-related filings is accurate and complete, and also acknowledge that any false, fictitious or fraudulent statements or claims made to NIH may subject the investigator to criminal, civil and/or administrative penalties.

9.     WUT is a university located in Wuhan, China.  It is considered a top-tier Chinese university recognized for its studies of science and technology.

10.     The "Chinese Talent Programs" refer collectively to various plans designed by the Chinese Government to attract, recruit, and cultivate high-level scientific talent in furtherance of China's scientific development, economic prosperity, and national security.  Implemented in 2008, the "Thousand Talents Plan" is the most prominent Chinese talent recruitment plan designed by the Chinese Government to incentivize individuals engaged in research and development in the United States to transmit the knowledge and research they gain here to China in exchange for salaries, research funding, lab space, honorary titles, and other incentives.  The Thousand Talents Plan is designed to lure both Chinese overseas talent and foreign experts to bring their knowledge and experience to China.  The so-called "World Recruitment Plan of Renowned Experts in China" is part of the Thousand Talents Plan.  The Chinese Talent Programs have rewarded individuals for stealing proprietary information and violating export controls.

### *Lieber's Affiliation with WUT and China's Thousand Talents Plan*

11.     According to records maintained by Harvard University, LIEBER traveled to WUT in mid-November 2011 ostensibly in order to participate in a Nano-Energy Materials Forum being hosted by WUT.  Just days before LIEBER's trip, a professor at WUT (hereafter the "WUT Professor") emailed LIEBER a "Contract for Strategic Scientist's Appointment" (hereafter the

"Strategic Scientist Agreement"). He also informed LIEBER that LIEBER had been recommended for the "The Recruitment Program of Global Experts," which I know to be part of China's Thousand Talents Plan. In subsequent communications on or about November 11, 2011, both LIEBER and the WUT Professor acknowledged that LIEBER would sign the Strategic Scientist Agreement at WUT on November 15, 2011.

12.     According to the agreement, which was written in both Chinese and English, LIEBER was appointed as a Strategic Scientist at WUT for five years from on or about November 15, 2011, until on or about November 14, 2016. LIEBER's objectives and tasks under the agreement were as follows:

**Article Two     Employment Objective and Tasks for Party B**

1. Make strategic, visionary and creative research proposals to guide the advancement of disciplines or scientific research institutes to become first class disciplines or scientific research institutes in China or the world, especially in frontier areas.

2. Supervise young teachers or receive them as visiting scholars, guiding or co-guiding postgraduate students (including post-doctoral students), leading them to the international forefront of related fields, jointly publishing academic papers in top international journals (in the name of WUT, and WUT faculty or students as the first author) or publishing high-level academic monographs and guiding young teachers to win national awards or influential international academic awards.

3. Build up a Discipline Innovative Team, introducing and cultivating high-level talents to be as qualified as those of China's 1000 Young Talents Plan, Distinguished Professors of Chang Jiang Scholars and winners of National Science Fund for Distinguished Young Scholars.

4. Conduct national important (key) projects or international cooperation projects that meet China's national strategic development requirements or stand at the forefront of international science and technology research field.

5. Carry out international exchanges and cooperation, and host or jointly host prominent international academic conferences in the name of WUT.

13.   According to the contract, WUT agreed to pay LIEBER $50,000 U.S. Dollars ("USD") per month, prorated according to LIEBER's "actual work time" at WUT. WUT also agreed to provide LIEBER with round-trip, business-class airfare to and from WUT. Finally, the agreement alluded to LIEBER's future involvement with China's Thousand Talents Plan, and allowed for seemingly greater monthly compensation to LIEBER in the future:

> 4. Once Party B gains a Chinese government-sponsored position through successful application for various Chinese talent-related projects, Party A shall adjust its payment terms to ensure that Party B enjoys more benefits on the principle of "taking the higher pay", but the same benefit terms will not be paid twice.

14.   LIEBER returned to Massachusetts from WUT on or about November 16, 2011. Two days later, in an email to the WUT Professor, LIEBER wrote, "I very much appreciate the effort that you put into making my visit a good one. I also agree that it would productive, and hope that we can push forward as per discussions to build up the joint laboratory to a truly world-level facility." Approximately one month later, on or about December 19, 2011, the WUT Professor emailed portions of a proposed website for the "WUT-Harvard Joint Nano Key Laboratory," which, according to the website, was established in 2009. The website prominently featured LIEBER's name, photograph and biographical information, and it identified him as the "Laboratory Director." In his email to LIEBER about the website, the WUT Professor noted that "the Chinese version [of the website] will be made after your approval for [sic] the English version."

15.   On or about April 3, 2012, approximately five months after executing the Strategic Scientist Agreement with WUT, the WUT Professor wrote an email to LIEBER informing him that he had been selected to participate in China's Thousand Talents Plan. At that time, LIEBER's selection entailed awards by WUT and the Chinese Government of approximately $158,000 USD

in "personal benefits" and nearly $800,000 USD in "research funding." Specifically, the WUT

Professor wrote,

> I am very happy to let you know that, in the **World** Recruitment
> Plan of **renowned** experts in China (also called as one thousand plan
> of foreign experts), you have been approved and awarded as invited
> strategic foreign expert by Chinese government because of your
> **world-leading** achievements, the **good collaboration basis**
> between you and WUT, and your great **contribution** to national
> academic exchange between China and USA. You are provided
> with personal benefit of one million RMB (~158,800 USD), a
> research funding of 5 million RMB (~794,000 USD) for
> development of WUT-Harvard joint nano key lab and collaboration
> research This plan is the highest plan/program for famous foreign
> scientists in Chinese scientific field and only 40 famous experts
> from the world were awarded. (Emphasis original.)

16.     Nearly three months later, on or about June 27, 2012, the WUT Professor shared

with LIEBER a contract titled "Employment Contract of 'One Thousand Talent' High Level

Foreign Expert" between LIEBER and WUT (hereafter the "Thousand Talents Agreement"). The

WUT Professor asked for LIEBER's "ideas/comments/suggestions" within "one week when your

schedule allows (of course, the sooner the better)." The first page of the agreement appeared as

follows:

## "千人计划" 高层次外国专家工作合同书
### EMPLOYMENT CONTRACT of
### "ONE THOUSAND TALENT" HIGH LEVEL FORTIGN EXPERT

聘任方：_____武汉理工大学_____（简称甲方）

受聘方："千人计划" 高层次外国专家、美国哈佛大学教授

Charles M. Lieber 博士（简称乙方）

Employer ( Party A ): Wuhan University of Technology

Employee (Party B ):" One Thousand Talent" high level foreign expert, professor **Charles M Lieber** from Harvard University, USA.

为保证" 千人计划" 高层次外国专家项目的顺利实施，保障甲乙双方的合法权益，根据中华人民共和国的有关文件精神和政策规定，经双方平等协商，订立本合同。

Both sides, in line with the principles of legality, fairness, equality, and mutual agreement, to ensure the implementation of "One Thousand Talent" high level foreign expert plan, and to guarantee the legal rights and obligations of both sides, on the basis of Chinese laws and rules concerned, agree to sign this contract.

第一条 聘期

" 千人计划" 高层次外国专家岗位首次聘期为三年， 该合同自签订之日起生效。聘任期满，经双方协商后，报上级主管部门审批，可续签下一期合同。

1. Duration of the Contract

The term of this contract will be 3 years since the date of signature. Both parties can sign the new contract through consultation and mutual consent after the contract is upon expiration with the permission of superior authorities department.

17.    The Thousand Talents Agreement was effective for three years "from the date of signature." Among other things, the agreement obligated LIEBER to conduct scientific research; to "publish high-level articles in the renowned and important international academic journals in the name of Wuhan University of Technology;" to assemble a research team with "strong ability of [sic] research and innovation" in LIEBER's field of expertise; to "guide 1-2 distinguished young scholars and 3-4 doctoral students ... and help them publish systematic articles in the international

8

renowned journals;" to "organize 1-2 predominant influencing international conferences in his field in the name of Wuhan University of Technology;" and "invite 1-3 international top scientists to work in the lab as visiting scholars." The agreement also required LIEBER to work at or for WUT "not less than nine months a year" by "declaring international cooperation projects, cultivating young teachers and Ph.D. students, organizing international conference[s], applying for patents and publishing articles in the name of" WUT.

18.     In exchange for his work for and on behalf of WUT, WUT agreed to pay LIEBER $50,000 USD per month, and living expenses of up to 1,000,000 Chinese Yuan (based on 2012 exchange rates, approximately $158,000 USD) to be paid over the three-year term of the contract. The contract also allocated 11,000,000 Chinese Yuan (or roughly $1.74 million USD based on 2012 exchange rates) for the joint Harvard-WUT Nano Key Lab and related research. The following portion of the contract documented those financial terms. WUT is referred to as "Party A," while LIEBER is referred to as "Party B."

二、甲方义务

1．依法维护乙方应享有的各项权利。

2．为乙方提供良好的工作和生活条件

(1)办公及实验室条件：甲方按乙方的要求为乙方提供办公及实验条件。

(2)科研配套经费：聘期内，甲方为乙方提供 1000 万元科研配套经费（其中包括国家拨款 500 万元），主要用于购置实验仪器设备、科研新方向和基础设施建设；此经费由甲方管理，乙方与甲方的合作教授共同商量支配。

(3)团队建设条件：甲方按乙方的要求为乙方组建学术团队，并每年投入 100 万元团队建设经费，主要用于开支团队成员的工资、安家补贴，团队及乙方本人的差旅等；此经费由甲方管理，乙方支配。

(4)生活条件：薪酬标准为每月 5 万美元（税前标准），按实际到岗时间支付；另享受 100 万元人民币的生活补贴（免税），分三年用支付。

(5)为乙方指导博士、博士后工作人员和高级访问学者等创造条件，人员由甲方推荐、乙方考察并最终确定。

3．为乙方提供完成本合同规定的工作目标及任务所需要的校内相关政策和支持。

2. Party A's Obligations

(1). Party A shall respect Party B's legal rights

(2). Party A shall provide Party B with necessary working and living conditions

a. working and lab conditions: Party A shall provide Party B with working and lab conditions according to Party B's requirement

b. scientific research funding: Party A shall provide Party B ten million Chinese Yuan (10,000,000 RMB) including five million RMB from national fund during the term of this contract to the construction of new direction and infrastructure construction, equipments and instruments purchasing. This amount of money shall be managed by Party A, and Party B can use it after discussing with the co-professor from Party A.

c. talent team construction condition: Party A shall construct talent team according to Party B's requirement and provide one million Chinese Yuan (1,000,000 RMB) as the funds of talent team construction each year. The funds shall be mainly used as the payment, accommodation, and travel expense of Party B and the team members. This amount of money shall be managed by Party A, and Party B can use it.

d. payment and living conditions: Party A shall provide Party B with fifty thousand U.S. Dollars ( $ 50,000) per month (before tax), paid according to his working time in Wuhan University of Technology. Party A shall provide Party B with one million Chinese Yuan (1,000,000RMB) (after tax) as living allowance which will be paid 1/3 a year for three years.

10

19.     In a subsequent email to LIEBER dated July 10, 2012, the WUT Professor told

LIEBER that WUT's president had signed the "1000 plan agreement" and that executed copies of

the agreement had been mailed to LIEBER in Massachusetts for his signature.  In an email dated

on or about July 21, 2012, the WUT Professor informed LIEBER that WUT had received copies

of the Thousand Talents Agreement signed by LIEBER.

20.     After signing the Thousand Talents Agreement, LIEBER returned to WUT in

November 2012.  LIEBER's travel expenses to and from Wuhan were paid by WUT.  Prior to this

trip, arrangements were made to pay LIEBER his salary and living expenses as specified in the

Thousand Talents Agreement.  For example, in an email dated on or about October 26, 2012, a

WUT employee (hereafter the "WUT Employee") wrote to LIEBER:

> Before your visit, I would like to talk about one detail in the
> implementation of the contract of "one thousand talent" high level
> foreign expert between you and our university.  According to the
> article concerning the payment and living conditions, I want to know
> the way you prefer to be paid so that everything can be prepared
> before your coming.  I would like to provide two options for you to
> choose if you do not mind.  Option one.  I help you open a new bank
> account in the Chinese Bank named [redacted].  The payment will
> be put into your account and you can get the payment from the
> branch of [redacted] in your country.  Option Two.  I can prepare
> the payment in cash.

21.     Less than three months later, on or about January 10, 2013, the WUT Professor

emailed LIEBER an agreement titled "Academic Cooperative Agreement between Harvard

University, USA and Wuhan University of Technology, P.R. China."  The stated purpose of the

agreement, which had a five-year effective term, was to "carry out advanced research and

development of nanowire-based lithium ion batteries with high performance for electric vehicles."

Apart from its stated objective, the agreement provided for a "cooperative research program"

whereby researchers from WUT would "visit Department of Chemistry and Chemical Biology of

Harvard University for two months each year." Without consulting any Harvard officials, LIEBER signed the agreement on Harvard's behalf and returned the executed copies to the WUT Professor on or about January 11, 2013. I understand from conversations with Harvard's representatives that LIEBER did not have the authority to execute this contract on behalf of Harvard.

22.     One year later, LIEBER continued to work closely with — and continued to receive compensation from — WUT. For example, on or about January 18, 2014, LIEBER wrote to the WUT Professor and another person affiliated with WUT that he would accept a WUT graduate student (hereinafter the "Graduate Student") as a long-term "WUT-HU joint Ph.D. student" provided that WUT "support all of [the Graduate Student's] salary and research costs while working in my lab." In the same communication, LIEBER discussed an upcoming visit to WUT in February 2014, and he made specific demands regarding the payment of his salary:

> I would like to receive ~1/2 of salary (for the current period) in US dollars, with the remainder deposited into the bank account that was set-up. The ~00 that I promised to pay for the party following Lin Xu's Ph.D. defense in April, can be deduced from either 1/2.

23.     In June of 2014, LIEBER continued to discuss his compensation under the Thousand Talents Agreement with WUT. In an email to the WUT Employee dated June 16, 2014, LIEBER asked to maintain his bank account "the way it has been for now" and he reiterated his earlier request that half of his salary be deposited into his Chinese bank account and the other half be paid to him in cash when he next visited WUT. LIEBER further stated, "I think this is close to what [we] have done in [the] past."

24.     In late January 2015, LIEBER outlined his ongoing relationship with WUT, confirming that he intended to visit WUT "several" times per year or "perhaps slightly more in the next couple years as we try to build up the nano-bio part of the lab;" that he would be available for "electronic communication on a very regular basis with students (email, telephone, skype) so that

they obtain full input from me as an advisor;" and that "students visiting [from WUT] for periods at Harvard would have [the] same access as normal Harvard graduate students."

25.     Around the same time, independent of LIEBER, Harvard administrators learned for the first time of the WUT-Harvard Joint Nano Key Laboratory at WUT, including the fact that LIEBER was the director of the lab.  Harvard officials confronted LIEBER about the joint lab, and informed him that the improper use of Harvard's name and logo — orchestrated by LIEBER without Harvard's consent — violated University policy.  In response, LIEBER falsely told Harvard officials that he was involved in collaborative research with WUT for "mutual scientific interaction," but that WUT was using Harvard's name and logo without his knowledge or consent.

26.     On or about February 3, 2015, LIEBER emailed the WUT Professor and told him that WUT must cease using Harvard's name, stating, "Our agreement for research collaboration is between you/Wuhan University of Technology (WUT) and me, and **does not** constitute an agreement with Harvard University."  (Emphasis original.)  Subsequent emails suggest that LIEBER took additional steps to try and distance himself — at least publically — from WUT in the wake of Harvard's discovery of the joint Harvard-WUT nano lab.  These included cancelling a trip to WUT in June 2015 and advising a postdoctoral fellow at the Lieber Research Group to continue her work in LIEBER's lab *rather* than starting a position at WUT.

27.     Nevertheless, LIEBER's Thousand Talents Agreement and the earlier Strategic Scientist Agreement (which, according to their terms, expired in July 2015 and November 2016, respectively) appear to have remained in place well after January 2015.  For example, in an email dated on or about February 20, 2015, LIEBER told the WUT Professor that he would continue his review of a manuscript written by WUT researchers.  In the same email, LIEBER also said that he "may be in touch with regards to several issues relating to my appointment/salary/funding @

WUT....." Although it is unclear what precise "issues" LIEBER was referring to, at a minimum, this email shows that LIEBER continued to be paid by WUT after January 2015.

28.     In an email dated November 26, 2015, the WUT Professor thanked LIEBER "for all you have done for our university and me!" The WUT Professor also told LIEBER that WUT had "put your salary in your ... [bank] card and we will help you change the cash for you when you come to Wuhan." The fact that WUT continued to pay LIEBER's salary in late 2015 indicates to me that LIEBER, in fact, continued to work for, and with, WUT throughout 2015.

29.     The payment of salary to LIEBER by WUT appears to have continued into 2017. In an email dated on or about January 14, 2017, the WUT Professor sent the following message to LIEBER:

> During our last meeting you mentioned the tour of Bejing in the end of Feb. or early March. President [of WUT]..., I and all faculties and students in our Joint Nano Lab would like to invite you to visit WUT and our Joint Nano Lab. If your schedule is available, we would like to take this chance to express our everlasting gratitude to your great support for our university and me! Our university has put your salary in your ... [bank] card and we will help you change the cash for you when you come to Wuhan. Our university will cover your first-class flight ticket and accomadation [sic] like before. We would like to know your idea. With my best regards and thank you very much for your strong support again.

By this point, according to their express terms, LIEBER's Strategic Scientist and Thousand Talents Agreements with WUT had expired. Insofar as it discusses the payment of additional salary to LIEBER in January 2017, this email is evidence that LIEBER may have executed a new agreement with WUT at some point in either late 2016 or early 2017.

### *Lieber's False Statements to DoD*

30.     Since 2009, LIEBER has been the principal investigator associated with at least six research grants funded by various DoD entities, including ONR and AFOSR. The total value of

these grants exceeded $8 million. As of April 2018, LIEBER was the principal investigator associated with three active DoD grants.

31.     On April 24, 2018, DoD investigators interviewed LIEBER about his active grants and whether LIEBER had appropriately disclosed foreign research collaboration to DoD. During the interview, which took place at LIEBER's lab on the Harvard Campus, LIEBER said that he was familiar with China's Thousand Talent's Plan, but that he had never been asked to participate in the program. Although LIEBER stated that he was never asked to participate in the Thousand Talents Program, he also told DoD investigators that he "wasn't sure" how China categorized him. I believe these statements were false because, as described above, WUT expressly asked LIEBER on numerous occasions in 2012 to participate in the Thousand Talents Program and to sign a Thousand Talents Agreement with WUT. Moreover, based upon the email correspondence described above that I have reviewed, LIEBER *did* sign a three-year Thousand Talents Agreement with WUT on or about July 21, 2012, and was paid by WUT over the course of several years pursuant to that agreement. The agreement that LIEBER signed was titled "Employment Contract of 'One Thousand Talent' High Level Foreign Expert" and it referred to LIEBER as a "One Thousand Talent."

32.     On April 26, 2018, two days after his interview with DoD, LIEBER emailed a research associate affiliated with the Lieber Research Group the following message:

> Can you also provide me with the link/info to CAS webpage where I am listed as directing (?) that lab at Wuhan? I lost a lot of sleep worrying about all of these things last night and want to start taking steps to correct sooner than later. I will be careful about what I discuss with Harvard University, and none of this will be shared with government investigators at this time.

I believe that "CAS" refers to the China Academy of Sciences, which I know to be a top Chinese research institute. According to Harvard University's website, LIEBER was elected to the CAS

in December 2015. At a minimum, this email demonstrates that LIEBER withheld information from "government investigators" about his relationship with WUT. Given the timing of this email — two days after his interview with DoD — I believe LIEBER was referring specifically to the DoD investigators.

### *Lieber's False Statements to NIH*

33.     I am aware that LIEBER was the principal investigator associated with at least three NIH-funded research grants awarded to Harvard University since 2008. The total value of those grants exceeded $10 million. Two of those grants were being actively funded by NIH as of November 2018.

34.     On or about November 15, 2018, NIH inquired of Harvard about whether LIEBER and/or Harvard had failed to disclose LIEBER's then-suspected relationship with WUT and China's Thousand Talents Plan. In order to respond to NIH's inquiry, Harvard interviewed LIEBER about his foreign affiliations generally, and any connection he might have to WUT in particular. Based upon information provided by LIEBER during that interview, Harvard submitted a detailed written response to NIH on or about January 10, 2019. I believe that LIEBER caused Harvard to make materially false and misleading statements about his connection to WUT and the Thousand Talents Plan in that written submission.

35.     Specifically, LIEBER caused Harvard to tell NIH that LIEBER "had no formal association with WUT" after 2012, but that "WUT continued to falsely exaggerate" LIEBER's involvement with WUT in subsequent years. This statement was false because, as described above, LIEBER maintained a formal, collaborative relationship with WUT between at least 2012 and 2017 that included the Visiting Scientist Agreement, the Thousand Talents Agreement, an Academic Cooperative Agreement between Harvard and WUT, and possibly other agreements.

36.     LIEBER also caused Harvard to tell NIH that LIEBER "is not and has never been a participant in" China's Thousand Talents Plan.  This statement was also false because LIEBER did, in fact, sign a three-year Thousand Talents Agreement with WUT on or about July 21, 2012.

*CONCLUSION*

37.     Based on the forgoing facts, and on my experience, training and discussions with other individuals involved in this investigation, I believe that probable cause exists to conclude that on or about April 24, 2018, LIEBER knowingly and willfully made materially false, fictitious and fraudulent statements to DoD in violation of 18 U.S.C. § 1001(a)(2).  In addition, I believe that probable cause exists to conclude that on or about January 10, 2019, LIEBER made and caused to be made a series of materially false, fictitious and fraudulent statements to NIH, also in violation in 18 U.S.C. § 1001(a)(2).

Robert Plumb
Special Agent, FBI


Sworn and subscribed before me this 27th day of January 2020.

MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE